**Willis L. GANTLIN, et al., Plaintiffs,**

v.

**WESTVACO CORPORATION, et al., Defendants.**

**Civ.A.No. 72–713–8.**

United States District Court,
D. South Carolina,
Charleston Division.

Oct. 19, 1981.

Morris J. Baller, San Francisco, Cal., for plaintiffs.

Leonard Appel, Washington, D.C., Hill B. Wellford, Jr., Richmond, Va., Arthur C. McFarland, Charleston, S.C., Harris Jacobs, J. R. Goldthwaite, Jr., Atlanta, Ga., for defendants.

## ORDER

BLATT, District Judge.

This action was filed in the United States District Court for the District of South Carolina on June 15, 1972, by plaintiffs, Willis L. Gantlin, Alphonse Gailliard, George Chatman, Clifford Graham, Charles Jenkins, and Christopher Jenkins alleging racial discrimination in employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. With the exception of Christopher Jenkins, each of the plaintiffs at the time the complaint was filed was an active employee of Westvaco's North Charleston Mill and a member of Local 508 of the United Papermakers International Union. Christopher Jenkins is a former employee of the Mill and former member of Local 508.

Plaintiffs' complaint charged Westvaco and each of the Unions having bargaining rights at the Mill with racial discrimination. The Union defendants are the International Association of Machinists and Aerospace Workers, AFL–CIO, and its Lodge No. 183 (IAM); the International Brotherhood of Electrical Workers, AFL–CIO, and its Local No. 1753 (IBEW); and the United Paper-

makers International Union and its Locals No. 435 and 508 (UPIU).[1] The complaint also alleged that each of the Unions had violated their duty of fair representation required by 29 U.S.C. § 185.

On March 14, 1973, the court entered an order allowing this action to proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, and defining the class as:

All black persons employed in bargaining unit jobs at Westvaco's North Charleston Paper Mill between July 2, 1965, and March 14, 1973.

In permitting the action to proceed as a class action as defined above, the court determined that plaintiffs were not proper representatives of black applicants for employment, or of black persons employed, in non-bargaining unit or salaried positions. This action, therefore, relates solely to conditions allegedly affecting black employees who subsequent to July 2, 1965, the effective date of Title VII, held hourly rated production and maintenance positions in the collective bargaining units at the Mill. Plaintiffs have alleged that black employees were discriminated against in job assignment and in transfer and promotional rights with respect to production and maintenance positions at the Mill until May 1968, and that union negotiated seniority practices have operated to unlawfully perpetuate such discrimination. Plaintiffs further alleged that discrimination continued after May, 1968, with·respect to maintenance apprentice positions.

On June 11, 1974, the court ruled that the trial of this action would proceed in a bifurcated two-stage fashion. On plaintiffs' motion, the first-stage trial, which commenced on July 17, 1974, and was concluded on August 15, 1974, was limited to issues of class discrimination. All issues of individual liability and monetary relief were specifically deferred for second-stage proceedings,

if necessary.[2] Additional hearings were held on July 14 and December 19, 1978, at the request of counsel for the respective parties to determine the scope of the issues in controversy and for the purpose of supplementing the record with additional evidence relevant to the outstanding factual and legal issues. On February 9, 1979, plaintiffs filed their post-trial brief containing proposed findings of fact and conclusions of law. The defendants filed their briefs with their proposed findings at various dates between August 31 and October 10, 1979. Thereafter, plaintiffs filed a reply brief on November 27, 1979. Oral argument on all issues was heard by the court on July 17, 1980.

The court has carefully considered the briefs of the parties, the joint stipulation of facts, and the voluminous trial record, including the supplemental evidence entered on December 19, 1978. The court, at the request of the parties, has also personally viewed the various mill operations. Based on the foregoing, the court now renders its findings of fact and conclusions of law in this matter.

## FINDINGS OF FACT

*History and Organization of the Mill:*

Westvaco's North Charleston Paper Mill commenced operations in 1937. The Mill is similar in its organizational and operational structure to other paper mills in the pulp and paper industry throughout the United States and Canada. Westvaco's Mill is engaged in the production of kraft paper and pulp and chemical by-products. The Mill is organized into the following functionally related areas of operation:

*Woodyard-Operating*

Reception center for wood supply in various forms. Converts roundwood into chips and mixes with purchased chips to

---

1. The United Papermakers International Union was created through a merger of the United Papermakers and Paperworkers and the International Brotherhood of Pulp Sulphite and Paper Mill Workers which took place in August, 1972.

2. As a result of unusual and extraordinary circumstances beyond the control of the parties or the court, the trial transcript was not completed and available for review until June 1, 1978.

supply pulp mill. Conveys bark and reject wood particles to supply the power boiler.

*Woodyard-Service*

Mill-wide clean-up, maintenance of grounds, and general service.

*Pulp Mill*

Takes wood chips from woodyard and processes into chemical pulp. Washes spent chemicals from pulp for recovery, and processes pulp for use in paper mill.

*Recovery*

Reclaims chemicals from spent pulping liquor and makes new cooking chemicals. Produces steam from burning organic waste.

*Paper Mill*

Receives virgin kraft pulp and self-generated waste and converts these into finished unbleached kraft liner-board and paper grades in roll form.

*Technical Services*

Specification testing of paper and linerboard.

*Water Treating*

Produces treated water for power and recovery boiler. Tests and regulates boiler water and treated liquid effluent of the entire mill.

*Finishing and Shipping*

Prepares for shipment, loads and ships finished products, and maintains customer inventory.

*Converting*

The Baler is the only portion of the converting progression in use. Its function is the mechanical baling of fluff-dried pulp.

*Power*

Produces electricity and is responsible for water supply to support all production facilities.

*Tall Oil*

Refines crude tall oil and converts to useful products for various industries.

*Polychemicals*

Extracts lignin from black liquor and converts to useful products for various industries.

*Receiving and Stores*

Receives, stores, and disburses parts and materials.

*Maintenance*

Maintains, repairs, and modifies plant and equipment as required.

Each production department consists of one or more lines of progression (sequences), or series of functionally related jobs in order of wage rate for promotion, demotion due to reduction in force, and progression purposes. In addition to the production departments and progressions, there are various maintenance departments and jobs. As of July 15, 1974, there were 1049 hourly employees who held production or maintenance positions—(hereinafter referred to as "bargaining unit jobs")—at the Mill. Of these 1049 employees, 222 were black and 827 were white.

*Collective Bargaining History*

The collective bargaining history at the Mill dates back to 1937 when the International Brotherhood of Electrical Workers—(IBEW and its Local B0776, later 1753)—was recognized as the bargaining representative for electricians. The other Union defendants gained representational rights in 1944. In that year, the United Papermakers and Paperworkers—(UPP)—and the International Brotherhood of Pulp Sulphite and Paper Mill Workers—(IBPS)—were jointly certified to represent employees in the paper mill and the Machinists—(IAM Lodge 183)—commenced representation for a bargaining unit of outside shop machinists.

The IBEW and IAM unions have historically bargained separately for employees within their respective areas of jurisdiction and have historically negotiated separate labor agreements. However, the UPP and the IBPS, pursuant to their joint NLRB certification, always bargained as a single entity and were parties to a common labor agreement covering a common bargaining unit of employees. At the initial stages of representation following their certification in 1944, the UPP chartered Local 435 and the IBPS chartered Local 508 to represent employees at the Mill. Later in the same year the IBPS, in response to a request from their black members, chartered Local 508A to represent black employees who at that time held only unskilled labor-type positions in the Mill. Local 508A's name was later changed to Local 620. The pattern of three separate bargaining units for the IBEW, IAM and UPP/IBPS and three separate labor agreements has continued to the present time.

The UPP/IBPS agreement was the product of collective bargaining proposals jointly drafted and bargained by a Union negotiating committee composed of representatives from Locals 435, 508 and 620. These proposals were embodied in a single collective bargaining agreement which established one seniority system covering a single bargaining unit and referred to the three locals as "the Union" throughout its various provisions. While the three locals had separate jurisdiction over various jobs within this bargaining unit, they negotiated as a single entity and the employees whom they represented were governed by the same contract terms under the same seniority system. Pursuant to this system, bargaining unit employees accumulated three types of seniority reflecting length of time in their job, in their department, and in the mill.

Commencing in 1964, Westvaco began the process of integrating the jobs and lines of progression at the Mill. Black employees who were thereafter assigned to jobs under the jurisdiction of Locals 508, or 435, or one of the other locals, were represented by those locals, and, conversely, white employees who were assigned to the 620 jobs were thereafter represented by Local 620.[3]

Local 620 continued in existence until May of 1968, when the jobs under its jurisdiction were merged into sequences represented by Locals 508 and 435. The negotiations between representatives of Locals 620, 508, and 435 and Westvaco concerning merger of the sequences took place in the spring of 1968. Following a vote of their memberships, each of the Locals, including 620, agreed to the terms of the merger and authorized their respective representatives to sign a formal merger agreement entitled "Memorandum of Agreement, Merger of Lines of Progression," dated May 8, 1968, and hereinafter referred to as the "Merger Agreement." Willis L. Gantlin, then President of Local 620, signed the Merger Agreement on behalf of the members of Local 620.

At approximately the same time as the merger of sequences the Charter of Local 620 was revoked by the International Union (IBPS) and the membership rights and privileges of Local 508 and 435 were extended to the former members of Local 620 who fell within their respective jurisdictions. The jurisdiction of Local 620 prior to May 8, 1968, is set forth in Appendix A, along with the jurisdictions of Locals 508 and 435 for the same period. There is no evidence that racial considerations influenced the actual structure of the lines of progression or the arrangement of jobs within the departments in the pre-merger period. Jobs were placed in lines of progression to accomplish the necessary business objective of training employees to perform various related mill procedures which are learned by advancement through functionally related positions. Unskilled jobs were not placed in the operating lines of progression because they were functionally unrelated to such positions.

---

**3.** Plaintiffs offered no evidence that black employees were discriminatorily denied membership in locals 508, 435, 1753 or 183.

The jurisdictions of Locals 508 and 435—(later 1435)—After May 8, 1968, are set forth in Appendix B. Both Appendix A and Appendix B are copied from the joint stipulation which counsel for the respective parties executed and filed prior to trial.*

The jurisdictions of Locals 1753—(IBEW) —and 183—(IAM)—were not affected by the May 8, 1968, Merger Agreement with the single exception that the Power Plant labor position, formerly represented by Local 620, was brought within the jurisdiction of Local 1753 and made the entry job as Poolman in the Power Plant sequence. Local 1753 was not a signatory to the Merger Agreement, nor was Lodge 183—(IAM).

The Production Departments directly affected by the Merger Agreement of May 8, 1968, were: Woodyard, Recovery, Tall Oil, Polychemicals, and Finishing and Shipping. No other department had a line of progression represented by Local 620. In the Finishing and Shipping Department, jobs formerly represented by Local 620 were merged into the sequence represented by Local 435. In the Woodyard, Recovery, Tall Oil, and Polychemicals Departments, former 620 jobs were merged with 508 sequences. Local 508 also assumed jurisdiction over the Woodyard Service Pool, including Custodial Service, formerly a part of Local 620's jurisdiction.

The actual arrangement of jobs in the merged sequences was negotiated between Westvaco and all of the affected unions for at least six months prior to the signing of the Agreement. The criteria followed in establishing and structuring the lines of progression has been the nature and functional relationship of the jobs to one another. This has been true both before and after the merger. Since most of the jobs formerly represented by Local 620 were unskilled jobs, it was not generally possible to slot them into the newly merged sequences at other than the entry level positions. To have done otherwise would have destroyed the functional relationship of the jobs in the operating lines, and this relationship was essential for continuity of operations.

*Hiring, Transfer, and Promotion Practices in the Pre-Merger Period*:

It is stipulated that at all times *since* May 8, 1968,—(the date of the Merger)—initial job placement into production jobs and lines of progression has occurred on a racially nondiscriminatory basis. It has also been stipulated that *prior* to 1964 black employees at the Mill were hired and assigned only to the unskilled positions over which Local 620 had jurisdiction.

The parties are in dispute with respect to the hiring, transfer, and promotion practices during the period from 1964 to May 8, 1968. Plaintiffs contend that discriminatory placement of black employees continued until May 8, 1968. It is defendants' contention that there was no discrimination in the initial placement or subsequent assignment of blacks at any time after 1964.

In the Stipulation, which all counsel executed prior to trial, plaintiffs conceded that between 1964 and May 8, 1968, a large number of black employees, through initial employment or transfer, were assigned to production and maintenance jobs which prior to 1964 had been held only by white employees. The names of such blacks, whom defendants were able to identify from records and memory, are listed in the Stipulation which the parties filed prior to trial. This list identifies 40 black employees, 12 of whom were assigned to non-620 jobs prior to July 2, 1965. Plaintiffs also stipulated that between January 1, 1965, and May 8, 1968, a large number of white employees were assigned to jobs represented by Local 620. More than 50 such white employees are identified in the Stipulation.

The parties have further stipulated that "notwithstanding Westvaco's placement of whites in 620 jobs and blacks in non-620 jobs during the period stated above," the sequences—(lines of progression)—represented by 620, with the exception of the Long Log sequence in the Woodyard, continued to be composed predominantly of black employees, and the sequences represented by the other Unions, with the excep-

* [Appendix A and Appendix B have been omitted for purposes of publication.]

tion of the Woodscaler sequence in the Woodyard, continued to be composed predominantly of white employees during the pre-merger period.

While new employees were required to satisfy certain education and test criteria to be eligible for employment during this period, Westvaco never required the passage of any test, or satisfaction of age or education requirements, for transfer to, or promotion within, the production sequences at the Mill. During all relevant times, until March, 1973, applicants for entrance into the respective apprenticeship programs took vocational aptitude tests administered by the South Carolina Employment Security Commission—(SCESC)—under the auspices of the United States Department of Labor. It is *stipulated* between the parties that no issue as to the unlawfulness of tests administered by the SCESC is presented in this case.

The parties have stipulated that at all times during the relevant period it was the policy of Westvaco, as set forth in Article IIB(3) of the labor agreement between Westvaco and Local Unions 435, 508 and 620, that "transfers between departments could occur either at the Company's request or at the request of an employee." It is further stipulated that at all relevant times persons desiring to transfer job sequences or departments, "regardless of their race," could complete transfer request cards, and that an employee who elected to transfer between sequences *within* a department retained both his departmental seniority and his mill seniority for all purposes. An example of a black employee who transferred from a 620 sequence to a 508 sequence within the same department prior to the merger is Willis L. Gantlin. Gantlin retained his departmental and mill seniority when he transferred to the position of extra man in the Tall Oil Department in April, 1967.

The record further discloses that, under the transfer request system, incumbent employees are given preference for vacancies over applicants from the street. In order to be eligible for transfer, an employee must have had a satisfactory disciplinary and attendance record. The only seniority consideration governing transfers between departments has always been the comparative mill seniority of the competing employees.

■ The court's analysis of the statistical evidence offered by plaintiff and Westvaco does not support plaintiffs' contention that discrimination in job assignments, promotion, and transfer continued until May 8, 1968, the date of the Merger. Plaintiffs' contention is based on speculation that 500 production employees were hired between 1963 and May, 1968. The source for this contention is deposition testimony of Westvaco's personnel representatives who were asked to speculate how many people on the average might have been hired over a ten year period. These witnesses testified that the average could be ten employees per month, but they further explained that there were several temporary large group hirings of people for major mill clean-ups and housekeeping efforts, and that the peculiarity of these temporary buildups distorted the true employment picture. Westvaco's personnel representatives also testified that they were guessing at these figures and they stated that during this period the Mill curtailed some operations, and automated others, and these factors had the effect of reducing the numbers of permanent employees needed.

Plaintiffs' statistical charts regarding employment and earnings are misleading because they omit employees of both races who the parties stipulated were hired during the period but who left the Company's payroll through normal attrition prior to August 30, 1972. The omission of such employees distorts the employment picture. There was significant attrition in the workforce between July 2, 1965, and August 30, 1972, the date used by plaintiffs for their analysis. Indeed, plaintiffs' statistics show only 15 black employees hired between July 2, 1965, and May 8, 1968, 12 of whom were hired prior to 1967. These figures which

plaintiffs have used as the source of their statistical charts and printouts confuse and are unrepresentative of the actual hiring pattern. An analysis of the evidence concerning employees actually hired and assigned between January 1, 1966, and May 8, 1968, reflects the following:

| Hires in 620 Jobs | | | Hires in Non-620 Jobs | |
|---|---|---|---|---|
| 1966: | 7 Blacks | 23 Whites | 11 Blacks | 41 Whites |
| 1967: | 2 Blacks | 24 Whites | 9 Blacks | 28 Whites |
| 1968: | 0 Blacks | 0 Whites | 4 Blacks | 5 Whites |

The evidence shows that 17 of the white employees employed during the period were experienced craftsmen, who were hired as first class journeymen in mechanical trades, namely, as pipefitters, outside machinists, metal workers, electricians, instrumentmen, and welders. Of these 17 employees, 10 were hired in 1966 and 7 in 1967. Of the black employees hired during the same period, only one, Johnny Snipes, was an experienced craftsmen in a mechanical trade. Snipes was hired in 1966 as a welder, 1st class. In the same period an offer of employment was extended to the only other black journeyman who applied, but he rejected the offer and moved out of the area. Plaintiffs offered no evidence that any black journeyman sought and was denied employment during this period.

If the 17 white craftsmen and 1 black craftsman are excluded from consideration, the record evidence as to employees hired in entry level bargaining unit positions during this period is even more demonstrative of non-discrimination:

| Hires in 620 Jobs | | | Hires in Non-620 Jobs | |
|---|---|---|---|---|
| 1966: | 7 Blacks | 23 Whites | 10 Blacks | 31 Whites |
| 1967: | 2 Blacks | 24 Whites | 9 Blacks | 21 Whites |
| 1968: | 0 Blacks | 0 Whites | 4 Blacks | 4 Whites |

The evidence before the court also reveals that in the January 1, 1964, to May 8, 1968 period, a number of black employees who had been hired in earlier periods exercised opportunities to transfer from 620 jobs to jobs and sequences represented by one of the other Unions, or to a salaried position. Such employees included S. M. Brown, E. Cusack, Silas Knight, Lawton McClendon, William Sease, H. N. Smith, Louis Brown, George Brown, Willis Gantlin, J. B. Edwards and A. D. Wright. At the same time, several white employees transferred from non-620 jobs to jobs and sequences represented by Local 620. Included in this group of white employees were F. A. Almers, M. D. Anderson, S. R. Weaver, and R. L. Ringley.

Much of plaintiffs' evidence at trial concentrated on three production departments, namely, Woodyard, Recovery, and Tall Oil. Hundreds of pages of the trial transcript contains repetitive versions of alleged preferential hiring in these departments. However, when this testimony is closely studied, it is clear that there were, in fact, relatively *few* hires of white employees in these departments during the relevant period. Listed below, by department, are the names of those white employees in each of the three departments who were hired in non-620 jobs between July 2, 1965, the effective date of Title VII, and May 8, 1968, the stipulated date of non-discrimination:

### WOODYARD

| BADGE NO. | NAME | HIRE DATE | RACE | INITIAL JOB |
|---|---|---|---|---|
| 5314 | H. R. Davis | 8/24/65 | W | Crane Hlpr. |
| 5398 | H. O. Ackerman | 12/6/65 | W | Crane Hlpr. |
| 5487 | G. K. Tolle | 3/22/66 | W | Crane Hlpr. |
| 5558 | M. D. Anderson | 7/19/66 | W | Crane Hlpr. |

### RECOVERY

| BADGE NO. | NAME | HIRE DATE | RACE | INITIAL JOB |
|---|---|---|---|---|
| 5329 | R. W. Smith | 9/14/65 | W | Util. Man |
| 4509 | J. R. Keefer | 12/17/65 | W | Util. Man |
| 5914 | J. A. Slotterback | 12/12/67 | W | Util. Man |

TALL OIL

| BADGE NO. | NAME | HIRE DATE | RACE | INITIAL JOB |
|-----------|------|-----------|------|-------------|
| 5334 | L. D. Knupp | 9/21/65 | W | Extra Man |
| 5743 | R. E. Dales | 1/10/67 | W | Extra Man |

With respect to the Woodyard, the record shows that M. D. Anderson was reassigned to a 620 job within three months of his employment and that he was discharged two months later. On November 27, 1967, Anderson was rehired as a laborer—(620)—in the Woodyard. He was discharged again on February 9, 1968. The other white employees whom plaintiffs cite as having received preferential treatment—(Coker, Reeves, Tucker, Williams, Ferraro and Horn)—were all initially hired in 620 jobs during this period. The evidence does not establish that any black employee sought and was denied transfer to the crane helper vacancies mentioned above. Several black employees, however, did elect to transfer to other 508 jobs in the Woodyard during the pre-merger period. No white employees, other than the four crane helpers identified above, were hired into a 508 job in the Woodyard between July 2, 1965, and May 8, 1968. As noted previously, there were approximately 50 white employees hired into 620 jobs during this period.

With regard to the Recovery Department, there is no evidence that any black employee sought and was denied transfer to the Utility Man position between July 2, 1965, and May 8, 1968. The evidence does show, however, that F. L. Green, a black employee, was hired in that position on June 2, 1967. Mr. Green and J. A. Slotterback, a white employee, were the only persons assigned to the Utility Man position between January 1, 1966, and May 8, 1968.

There is no evidence that any black employee sought and was denied transfer to the extra man job in the Tall Oil Department between July 2, 1965, and May 8, 1968. The record discloses that Willis Gantlin was offered the job which Dales received in 1967, but he refused such employment because he was not interested in transferring at that time. Mr. Gantlin, who was then president of Local 620, later elected to transfer to the extra man position in April, 1968, as did J. B. Edwards, another black employee, when it was clear that the merger of the sequences was imminent and Local 620 would soon cease to exist.

Other evidence which refutes plaintiffs' contention that discrimination in job assignments continued until the merger is contained in documents indicating Westvaco's efforts during the period to attract qualified black applicants for some of the more responsible positions at the Mill.

The record establishes that Westvaco initiated a series of affirmative action measures beginning in 1963, and continuing thereafter, which were designed to aid in the recruitment of qualified black employees. In February, 1963, Westvaco contacted Dr. T. C. McFall, a recognized black leader in the Charleston area and a representative of the NAACP, and requested his assistance in locating qualified minority candidates. Julius H. W. Guerard, who at that time was Westvaco's Employment and Benefits Coordinator, testified as to various recruitment efforts initiated by the Mill during 1963. A list of minority referral sources was established in March, 1963. In December, 1963, Westvaco publicly announced its policy of equal employment opportunity and sought and obtained from each of the unions, including Local 620, written commitments to non-discrimination.

In an effort to recruit minority applicants with craft-maintenance skills, Westvaco contacted the H. A. DeCosta Company in 1965. The DeCosta Company was a local construction company owned and operated by a black business leader. Westvaco requested Mr. DeCosta to refer to it black journeymen, carpenters and painters who might be interested in employment at the

Mill. Similar contacts were established with the Charleston Naval Base and with the State Employment Agency. Westvaco's efforts to recruit minority journeymen met with little success, however, because there were so few black craftsmen in the labor market at that time. The evidence reveals that in those instances where recruiting sources did produce qualified minority candidates, Westvaco responded affirmatively and offered these candidates employment in non-620 jobs. An example is James Sessions, who was hired in 1964 as a brickmason. Other blacks hired in the same period of time included Leon Forrest who was hired on March 10, 1964, as a laboratory assistant, and Otis Robinson and Richard Parson, who were hired as painters. These employees were all hired prior to the effective date of Title VII. Furthermore, offers were extended to other black candidates during this period, but such offers were refused. A black machinist who had been in the Navy was offered employment as an Inside Machinist Journeyman in 1965, but he did not accept the offer.

The names of other black employees hired into non-620 jobs in the pre-merger period are listed in the Stipulation which all counsel signed prior to trial. The jobs in which these black employees were hired covered a variety of maintenance and production departments in the Mill. J. Hamilton was hired as brokeman on the Paper Machine on July 15, 1966; C. Pinckney was hired as a poolman in Converting on November 29, 1966; H. Green, W. E. Kennedy, and Bobby L. Lucas were hired as poolmen in Finishing and Shipping on May 16, 1967, November 13, 1967, and July 5, 1966, respectively; F. L. Green was hired as a utilityman in Recovery on June 2, 1967; J. Snipes was hired as a welder in Maintenance on April 5, 1966; C. Singleton was hired as an oiler—(lubrication serviceman)—in Maintenance on June 3, 1966; and a number of other blacks were hired as machine girls or utilitymen, which were 508 positions in the Bag Plant.

The evidence further reflects that Westvaco took steps to encourage incumbent black employees during the pre-merger pe-

riod to transfer from 620 jobs to positions which, prior to 1964, had been held only by white employees. Willis Gantlin was offered, but did not accept, the job of extraman in Tall Oil in 1967. As noted previously, Mr. Gantlin later changed his mind and, along with J. B. Edwards, transferred to the extraman position approximately a month before the merger. The names of nine other black employees who exercised their rights to transfer from 620 jobs to non-620 jobs between 1963 and May 8, 1968, are identified in the Stipulation. As apprenticeship positions became available during the pre-merger period, notices of such openings were given to plaintiff Gantlin and other 620 leaders, and they were encouraged to refer interested members from their union.

Westvaco's staffing of the Woodscaler positions in 1964, and the Long Log positions in 1966, in the Woodyard provides additional evidence of its affirmative efforts in the pre-merger period to place employees in a non-discriminatory fashion. Woodscaler, a 508 position, was staffed with equal numbers of white and blacks, as was Long Log Operator, a 620 position.

*The Transfer Request System:*

At the trial of this case, plaintiffs contended that Westvaco's transfer request system was administered in a discriminatory manner in both the pre-merger and post-merger periods. In support of this contention, plaintiffs introduced an exhibit which purported to list various requests for transfer by black employees, which requests were allegedly unfairly denied by Westvaco. The list contained requests for transfer to both production and maintenance positions. Westvaco responded to this allegation by introducing various exhibits revealing successful transfers by blacks, and unsuccessful transfer requests by many white employees. Testimony was also presented by Westvaco's personnel representatives indicating the non-discriminatory reasons for its selection decisions. An analysis of this evidence supports Westvaco's contention that the transfer request system did not operate to discriminate against blacks.

As pointed out by Westvaco, in a few instances persons listed in plaintiffs' exhibit were actually white, not black. As to persons not erroneously listed, Westvaco produced evidence which clearly demonstrated non-discriminatory reasons why such individuals did not receive the specific job requested. In many instances, such individual had filed multiple requests for transfer, and one or more of these requests had been granted, which removed him from consideration for the position listed by plaintiffs. In certain instances the request was mooted by the merger of sequences, and in other instances the individual filing the request left the Company's employment before there was a vacancy. In many other cases, the person who was awarded the position was another black employee. In still other cases, the request was not favorably considered because the employee had a poor attendance or disciplinary history.

*The Apprenticeship Programs:*

An additional contention of plaintiffs at the time of trial was that Westvaco and the Unions, both before and after May 8, 1968, discriminated against blacks in the administration of various craft apprenticeship programs. There were craft apprenticeship programs at the Mill for the following six trades:

Electrician—(represented by IBEW Local 1753),

Instrument Man—(represented by IBEW Local 1753),

Outside Machinist—(represented by IAM Lodge 183),

Inside Machinist—(represented by IAM Lodge 183),

Pipefitter—(represented by UPIU Local 508),

Metal Worker—(represented by UPIU Local 508).

Each of these programs is a four-year program requiring substantial class room and on-the-job instruction. Specifically, plaintiffs have contended that blacks who requested transfer to the apprenticeship programs were not selected on an equal basis with whites, that the test and educational criteria for selection had a discriminatory impact on blacks, and that the age standards unlawfully excluded older blacks from consideration. Westvaco and the Unions denied each of these allegations and, in support of their positions, introduced substantial evidence concerning the selection rates for blacks and whites, the content of each apprenticeship program, and the reasons individuals were or were not selected. An analysis of all the evidence regarding selection of apprentices reveals the following.

Each of the apprenticeship programs, including the published standards for apprenticeship contained therein, were approved by, and registered with, the United States Department of Labor, Bureau of Apprenticeship and Training.

Westvaco's apprenticeship programs were instituted on the following dates: Outside Machinists—(1956), Inside Machinists and Pipefitter—(1957), Electrician—(1960), and Instrument Man and Metal Workers—(1963). The published standards in the respective programs required apprenticeship applicants to be at least 18 years of age, to be a high school graduate, or to demonstrate evidence of having obtained equivalency, and to pass a vocational aptitude test. The upper age limitation for the electrician, metal worker, pipefitter and instrument man programs was set at 30 years. The age limitation for inside and outside machinists was set at 25 years.

At all relevant times until March, 1973, applicants for entrance to the apprenticeship programs took vocational aptitude tests administered by the South Carolina Employment Security Commission— (SCESC)—under the auspices of the United States Department of Labor. Plaintiffs stipulated that they did not contend that such tests were discriminatory; they raised no issue as to the legality of tests administered by the SCESC; and they did not contend that the admittedly rigorous classroom training, which apprentices must successfully master, was other than job related.

Between 1961 and sometime in December, 1969, incumbent employees who desired

to transfer to the apprenticeship programs from other departments were required to take the Bennett Mechanical Aptitude Test administered by Westvaco's personnel department. In December, 1969, the Bennett test was discontinued for all applicants and the educational requirement waived for blacks hired prior to May 8, 1968. The record indicates that in January, 1974, Westvaco and the defendant Unions agreed to waive the age standards for affected class employees who at the time of their employment were not already beyond the published age levels. The age standards in the programs were suggested by the United States Department of Labor at the time the programs were established.

The first requests for transfer to each of the apprenticeship programs by a black employee occurred on the following dates:

| | | |
|---|---|---|
| Paul Green | 5/02/68 | Outside Machinist Apprentice |
| Malachi Simmons | 5/08/68 | Instrument Man Apprentice |
| K. O. Moore | 5/15/68 | Electrician Apprentice |
| Earl Brown | 5/17/68 | Metal Worker Apprentice |
| E. J. Cook | 6/18/68 | Pipefitter Apprentice |
| Odell Grant | 8/ /71 | Inside Machinist Apprentice |

The record reveals that two employees were selected for the Outside Machinist Apprentice program in 1968. One of those selected, Malachi Simmons, was a black employee. Although Paul Green was not selected, the evidence indicates that he made other requests for transfer which were granted. He had also requested transfer to the Technical Service Department, which request was granted on August 26, 1968. Thereafter, Mr. Green transferred to Engineering Aide, a salaried position, on July 2, 1973. As noted above, in 1968, Malachi Simmons requested transfer to both Outside Machinist Apprentice and Instrument Man Apprentice. The next Instrument Man Apprentice selection was not made until 1970. By that time, Mr. Simmons was no longer a candidate for the Instrument program since his request to enter the Outside Machinist program had been granted on May 29, 1968. Similarly, K. O. Moore filed more than one request for transfer in 1968. He also sought transfer to the Pulp Mill which was granted on July 15, 1968. The record discloses that electrician apprentices were not selected following Mr.

Moore's application until 1970. At that time, two persons were selected for entrance to the Electrician program, and one of these two was William Frederick, a black employee.

The first Metal Worker apprenticeship opening subsequent to Earl Brown's application did not occur until 1974. In the interim, Mr. Brown filed a request for transfer to the Finishing and Shipping Department which was granted on July 15, 1968. Two employees were selected for the Metal Worker apprenticeship program on February 18, 1974. Elijah Youngblood, a black employee, was one of the two selected.

The first Pipefitter apprenticeship opening following E. J. Cook's application occurred in October, 1968. One white and one black employee were selected at that time. The black employee was Wilson Melvin. The record establishes that E. J. Cook had a record of excessive absenteeism during this period, which record made him a questionable candidate. Mr. Cook's absentee record failed to improve, notwithstanding progressive discipline, and on February 22, 1973, he was discharged for unexcused absenteeism. The Company's decision to terminate Mr. Cook was upheld by Arbitrator Francis Flannagan on November 20, 1973.

The record establishes that only one person was selected for Inside Machinist Apprentice subsequent to Odell Grant's application. This person, J. C. Cotheran, was selected on March 1, 1974. Westvaco introduced evidence that there were 16 white employees, who, like Mr. Grant, also applied for transfer to this program, but who were not selected. As in the case of E. J. Cook, Mr. Grant had a poor absentee record.

At the time of trial, there were 1049 persons employed in bargaining unit jobs. Of this number, there were 222 blacks (21.2%) and 827 whites (78.8%). Westvaco introduced exhibits reflecting the names and race of persons selected for each of the apprenticeship programs subsequent to the initial application by a black employee. Throughout such period, there were 21 whites and 12 blacks selected. At the time

of trial, there were 22 employees who held positions in the apprenticeship programs at the Mill. Of this number, 9—(40.9%)—were black and 13—(59.1%)—were white.

Evidence was also introduced by Westvaco as to the number of white and black applicants who had competed for selection to the various apprenticeship programs. The following table summarizes this evidence and portrays the applicant and selection rate of blacks for each program, and for the programs as a whole:

Outside Machinist

| Black Applicants | 20 | (21%) |
| White Applicants | 77 | |
| Blacks Selected | 4 | (36%) |
| Whites Selected | 7 | |

Instrument Man

| Black Applicants | 1* | (The black candidate was Otis Washington who was disqualified because of absenteeism.) |
| White Applicants | 20 | |
| Blacks Selected | 0 | |
| Whites Selected | 2 | |

Electrician

| Black Applicants | 22 | (27%) |
| White Applicants | 58 | |
| Blacks Selected | 3 | (50%) |
| Whites Selected | 3 | |

Metal Worker

| Black Applicants | 5 | (28%) |
| White Applicants | 13 | |
| Blacks Selected | 1 | (50%) |
| Whites Selected | 1 | |

Pipefitter

| Black Applicants | 29 | (25%) |
| White Applicants | 85 | |
| Blacks Selected | 4 | (36%) |
| Whites Selected | 7 | |

Inside Machinist

| Black Applicants | 3 | |
| White Applicants | 17 | |
| Blacks Selected | 0 | |
| Whites Selected | 1* | (The only apprentice selected for this program during the period was J. C. Cotheran, a white employee, who was selected on March 1, 1974. There were only 2 black employees who, in addition to Odell Grant, filed requests for this program. One of these black employees, H. Wigfall, withdrew his request, and the other, H. Mack, also applied for the Outside Machinist Program and was selected for that program on June 2, 1972. Mr. Grant, as already noted, had a poor absentee and disciplinary record.) |

The record discloses that there have been in the aggregate 270 whites and 80 blacks who applied for an apprenticeship position in at least one of the programs. Thirty-three persons were selected during the period in question of whom 12 were black employees. Thus, while only 23% of the applicants were blacks, 36% of those selected were black.

The evidence as to the success of black and white apprentice applicants on the Bennett Mechanical Test reveals that during the time the test was in use—(prior to December, 1969)—only 1 black and 13 white employees failed to achieve satisfactory scores on the test. No evidence was offered by plaintiffs which suggested that the Bennett test, as used by Westvaco, ever had a disparate impact on black applicants.

■ The foregoing evidence concerning the selection of black and white candidates shows no discrimination in the choice of apprentices. Moreover, a case by case analysis of the individuals cited by plaintiffs as being discriminatorily denied admission to apprentice positions does not support plaintiffs' contention. Many of the blacks listed made requests for transfer to more than one apprenticeship program, and were selected for one of the programs, which selection removed them from consideration for the specific program listed by plaintiffs. This is true of Malachi Simmons, George Lee, Elijah Youngblood, Thomas Smalls, Jerome Thompson, Joseph Brown, and Henry Mack. There are several people listed by plaintiffs who left the employment of the Company or transferred to salaried non-bargaining unit positions prior to the time there was an opening in the requested apprenticeship program. Included in this group are Kenneth Moore, Earl Brown, Earl Cook, Leon Mayes, Richard Scott, and John Utsey. Finally, there are others listed who also requested transfer to production departments and these transfers were granted. Such employees included Robert Campbell, Paul Green and Frederick Jenkins. In summary, the evidence shows no discrimination in the selection of apprentice candidates for the various apprenticeship programs.

■ Plaintiffs, in apparent recognition of the weakness of their contention concerning apprentice selection, concede in their post-

trial brief that the evidence "does not suggest an across-the-board pattern of under representation of blacks among apprentices" and that "the record is *inconclusive* with respect to the overall hiring pattern." Plaintiffs argue, however, that certain individual blacks were unlawfully denied admission to the apprenticeship programs after May, 1968, because of the age standards. Plaintiffs contend that the age standards, which were waived for affected class employees in January, 1974, perpetuated discrimination against blacks who in prior years could not be assigned to the jobs because of their race. Plaintiffs' theory regarding illegal perpetration of race discrimination through age standards has been judicially accepted by the Fifth Circuit. *James v. Stockham Valve Fittings Co.,* 559 F.2d 310 (5th Cir. 1977); *Stevenson v. International Paper Co.,* 516 F.2d 103 (5th Cir. 1975); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir. 1974). There are only four black employees cited by plaintiffs as being affected by this practice. They are Devonne Fladger, Clement Singleton, Robert Campbell and Franklin Carter.

Plaintiffs contend that Mr. Fladger and Mr. Campbell were discriminatorily denied admittance to the Electrician apprenticeship program, that Mr. Fladger was also denied admission to the Instrument Man program, that Mr. Singleton and Mr. Carter were denied admission to the Outside Machinist program, and that Mr. Carter also was denied the position of Oiler.

Fladger and Campbell were hired in 1970, two years *after* the stipulated date of nondiscrimination. The evidence does not establish that either was ever denied a job because of his race. To the extent the age standard affected them, it did so in a nondiscriminatory fashion.

The employment record card for Clement Singleton shows that he was hired as a temporary janitor in January, 1966, and on June 3, 1966, was rehired on a permanent basis as an Oiler, a non-620 position. Singleton never applied for the apprenticeship programs and he testified that he did not become "interested" in the Machinist program until 1972, at which time he was beyond the age standard. This evidence does not indicate that he was discriminated against because of his race; hence, the age standard could, not have perpetuated any discrimination in his case.

Franklin Carter was hired in 1962 as a laborer at the age of 24. Mr. Carter testified that he tried unsuccessfully to be assigned to the Oiler position and to the Millwright Shop—(Outside Machinist). The evidence reveals that the Oiler job which Mr. Carter sought was awarded to another black employee and there has never been an age standard applicable to Oilers. Regarding his request for an Outside Machinist position, Mr. Carter testified that he first requested this assignment in 1973. There was no record of Carter's request in the Company's files; moreover, the evidence indicates that no apprentices were selected for the Outside Machinist program in 1973. In fact, no apprentices were selected for that program until February, 1974, after the age standard had been waived. It follows, therefore, that Mr. Carter was also unaffected by the age standard.

*Structure of the Lines of Progression under the Merger Agreement of May 8, 1968:*

█ Although it is stipulated that there was no discrimination in assignments to line of progression jobs in the production departments after May 8, 1968, plaintiffs asserted at trial that the terms of the merger agreement operated to favor white employees at the expense of blacks, and plaintiffs suggested that the lines of progression could have been restructured to have hastened the advancement of blacks to the top jobs in the sequences. The court finds no merit to these contentions.

The record establishes that the basic considerations which controlled the restructuring of the UPP/IBPS lines of progression were that jobs be arranged to ensure continuity of operation and to functionally relate in the best possible manner. The rates of pay are indicative of the skill and complexity levels of the jobs. There is no question but that the 620 jobs were essentially unskilled positions, whereas the jobs in the 508

and 435 lines of progression required substantially greater skills and responsibility.

When it was possible to do so, the 620 jobs were slotted above the entry level position in the new line of progression. In the Woodyard Operating Department, the crane helper job, which was formerly the entry level 508 position, was eliminated and replaced with a dual route of promotion through either the longwood operator position or the woodscaler position. In the Finishing and Shipping Department, the position of car bracer, which was formerly a 620 job, was slotted ahead of the pre-merger 435 jobs of roll finisher and senior roll finisher. In other instances, the merger resulted in a direct promotional route from the former 620 job to the initial job in the sequence represented by one of the other defendant Unions. As a result of the merger, the 620 job of laborer was generally eliminated and replaced with an upgraded classification of poolman, which became the entry level position in the majority of the lines of progression. The effect of the merger was to give persons in the 620 jobs an immediate avenue to higher positions without the necessity of transferring sequences.

As a practical matter, there was no other way that the sequences could have been restructured which would have preserved the necessary functional relationship in the higher jobs and still offered protection to the 620 members already in the affected departments. By placing the 620 jobs in the promotional sequence, the defendants gave promotional preference to those employees who held 620 jobs, in the affected departments, prior to the merger, since employees who desired to transfer to those departments thereafter could not bypass those employees. Plaintiffs' post-trial brief concedes that, at least since the merger, black employees have automatically promoted up the lines of progression according to seniority and qualifications and have not been bypassed by junior whites unless black employees waived promotion.

The court finds that the lines of progression are properly structured. Jobs within each line are functionally arranged in a manner which recognizes the skill and complexity of the positions and which provides the essential on-the-job training needed for successful performance. There is no evidence that racial bias played any part in the restructuring of the lines. On the contrary, the restructuring of the lines was rational and served to enhance the promotional opportunities of black employees.

The court has also considered plaintiffs' contention that a special "run around" provision was negotiated as part of the merger agreement to protect white employees who had pushed up to higher jobs in the Finishing and Shipping Department. The so-called "run around" provision to which plaintiffs refer pertained to an agreement reached by the parties concerning the contract rights of persons in the poolman, car loader and senior roll finisher classifications who, prior to the merger, had regularly "pushed up" to a higher job in the sequence.

As noted in the Stipulation, it has always been the practice in all lines of progression for employees to push up to jobs above their own for training purposes and to cover temporary vacancies. Pushing up occurs for vacation and absentee relief, and as an explicit training technique. The "regular" push up man is one who routinely fills in as the relief man and by doing so gains contract rights for permanent promotion to the position. In the merger negotiations, it was agreed that these contract rights would be honored and that employees in these three classifications who had already pushed up and qualified on the next higher job would continue to fill the next vacancy in that position, notwithstanding the fact that the sequence had been restructured. Thus, certain senior roll finishers who were white were permitted to promote directly to the position of truck driver, and black employees in the poolman and car loader positions, who had previously pushed up to the car bracer position, were permitted to bypass white employees in the roll finisher category when the next car bracer vacancy arose. The evidence does not establish that this provision operated to dis-

criminate against blacks or unfairly benefited white employees. It merely preserved vested contract rights.

*Seniority Practices:*

At the trial in this case, plaintiffs also contended that the job seniority system at Westvaco was unlawful because it operated to perpetuate pre-Act discrimination. Subsequent to the trial, however, the Supreme Court rejected the logic of the line of cases which had adopted that legal principle and ruled that an otherwise legitimate seniority system does not violate the law simply because it may perpetuate discrimination from an earlier period. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 353–354, 97 S.Ct. 1843, 1863–64, 52 L.Ed.2d 396 (1977); *United Airlines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). The contention now raised by plaintiffs is that the seniority system at Westvaco was not "otherwise legitimate" within the meaning of *Teamsters* because it allegedly had its genesis in racial discrimination. This contention requires a thorough review of the seniority practices at the Mill.

■ In making its analysis, the court, in keeping with the suggestion of the Fourth Circuit in *Patterson v. American Tobacco Company*, 634 F.2d 744 (4th Cir. 1980), has considered, among other factors, the areas of inquiry cited by the Fifth Circuit in *James v. Stockham Valves & Fitting Co.*, 559 F.2d 310, 350–353 (5th Cir. 1977), and in *United States v. Georgia Power Co.*, 634 F.2d 929 (5th Cir. 1981). These areas of inquiry include: (1) whether the seniority system operates to discourage all employees equally from transferring between seniority units; (2) whether seniority units are in the same or separate bargaining units—(if the latter, whether the structure is rational and in conformance with industry practice); (3) whether the seniority system had its genesis in racial discrimination; and (4) whether the system was negotiated, and has been maintained, free from any illegal purpose.

■ Reviewing the second of these factors, the record in this case establishes that at all pertinent times there have been three bargaining units and three separate labor contracts at the Mill covering employees represented by the IAM, the IBEW, and the UPP/IBPS. The establishment of separate bargaining units for machinists—(IAM)—electrician/power production personnel—(IBEW)—and other production and maintenance employees—(UPP/IBPS)—is rational and in conformance with National Labor Relations Board precedent. There is no evidence that the creation of separate bargaining units in this manner was in any way the product of racial considerations.

It is incorrect to suggest, as plaintiffs do, that a separate seniority system existed at the Mill for blacks and whites. The record shows to the contrary that during the pre-merger period, the UPP/IBPS local unions —(Local 620, Local 508, and Local 435)— jointly bargained for their respective members as a single entity in a single bargaining unit. The contract rights of bargaining unit employees that resulted from these negotiations were set forth in a single collective bargaining agreement which established *one seniority* system and referred to the three unions as the "*Union*" throughout its various provisions. Thus, while the three local unions had separate jurisdiction over various jobs for grievance handling purposes, they negotiated as one union, and their members were all governed by the same contract terms under a common seniority system. Pursuant to this system, bargaining unit employees accumulated three types of seniority reflecting their time in their job, their department, and the mill. Under this system of seniority, commonly known in industrial relations parlance as a job seniority system, job seniority applied to promotions and to demotions within lines of progression; departmental seniority was utilized as a tie-breaker between employees in the same line of progression who had identical job seniority, and applied to layoffs from the department; and mill seniority applied to transfers between departments and to mill layoffs.

The record establishes that a virtually identical system of job, departmental and

mill seniority was separately negotiated by the IBEW and the IAM for employees in the bargaining units under their jurisdiction. This type of seniority system is common throughout many industries in the United States and is by no means unique or peculiar to Westvaco's North Charleston Mill or to the Southern paper industry. While the three labor agreements for the IBEW, IAM and UPP/IBPS bargaining units naturally differed in certain respects, each possessed the same type of job seniority system in essentially the same terms.

With respect to the first of the aforesaid factors cited in *Stockham Valves, supra,* the record establishes that the seniority system at Westvaco operates exactly in the same manner with respect to black and white employees. The seniority consequences of transferring from one line of progression or department to another are the same for all employees within the bargaining units. The seniority rules themselves are color blind and apply in precisely the same way irrespective of the race of the person making the transfer.

■ Turning attention to the third and fourth factors cited in *Stockham Valves, supra,* while it is true that the seniority system at the Mill originated at a time when racial discrimination was the custom, there is absolutely no evidence that the seniority system was adopted for the purpose, in whole or in part, of discriminating against any employee because of his race. Similarly, the evidence does not prove that it has ever been maintained for such purpose. The evidence establishes, to the contrary, that the impediment which black employees faced prior to 1964 was overt discrimination in job assignments pursuant to a practice, then common in this country, but nonetheless deplorable, of relegating blacks to unskilled jobs. The fact that the seniority system was established at a time when such a custom or practice existed does not of itself render that system non-bona fide, or compel a finding that such system had its genesis in racial discrimination. Once the job assignment impediment was lifted, the evidence indicates that blacks moved freely

between and within the lines of progression and utilized their seniority rights on the same terms as whites.

It is noteworthy that plaintiffs do not contend that the seniority system under the UPP/IBPS agreement operated to discriminate against black employees hired into non-620 jobs; nor have they contended that this system discriminated against white employees hired into, or assigned to, 620 jobs before the merger. Yet this system affected these white employees in the same manner as blacks. It is also noteworthy that plaintiffs have not contended that the IAM and IBEW seniority systems had their genesis in racial discrimination, even though they are virtually indistinguishable from the UPP/IBPS system, and these systems were established at or about the same time. In any event, the evidence does not, in this court's opinion, support such a contention had plaintiffs attempted to advance it.

The evidence establishes that black employees who were assigned to non-620 jobs and lines of progression in the pre-merger period had the same seniority rights and privileges, pursuant to the same seniority system, as white employees who were similarly assigned to such jobs. This was also true as to white and black employees who held 620 jobs prior to the merger. The record reveals that when a black employee, or, for that matter, a white employee, transferred from a 620 job to a job represented by Local 508 or Local 435 in the same department, he retained both his departmental and mill seniority.

When the merger of sequences took place in May, 1968, the seniority provisions of the merger agreement specifically preserved this practice by specifying that "where existing progressions of jobs are merged into a new progression, employees will carry with them their current job, department and Mill seniority." For example, when the 620 car bracers were inserted above the roll finishers in Finishing and Shipping, there was no loss of any previously acquired seniority. This was because the same seniority system existed before and after the merger.

The fact that plaintiffs have never contended that the seniority system was not "bona fide" with respect to blacks hired in non-620 jobs before the merger, and the fact that they concede that this system had no discriminatory impact on persons hired after the merger, seems to the court to be a telling admission that the system is facially and operationally neutral. The system itself is color blind and affects all persons in the same manner, irrespective of their race.

The *Teamsters* decision was handed down by the Supreme Court in May, 1977, approximately one year and seven months before the December 19, 1978, post trial hearing in this case. Plaintiffs had ample opportunity to move to reopen the record for the introduction of additional evidence, if any was available, on the issue of whether the system was bona fide, but elected not to do so. The Court did permit additional evidence to be submitted, and Westvaco exercised its opportunity to introduce various supplemental exhibits.

In summary, the evidence establishes, and the court finds, that the seniority systems embodied in each of the Union contracts are "bona fide" and legitimately and legally maintained within the meaning of § 703(h) of Title VII.

*Literacy and Mathematical Requirements of the Non-620 Jobs:*

 The record further establishes that all of the non-620 jobs required literacy and mathematical ability. As one advanced in the sequence, the complexities of the jobs increased, and a higher degree of skill was necessary for satisfactory performance. The job requirements and skill levels necessary to perform the jobs in the various departments were described in detail during the course of the trial. Moreover, the court personally viewed many of the jobs in the production areas.

Westvaco produced uncontradicted evidence regarding the complexities of the various operating procedures and the training periods required for satisfactory performance in various positions. Superintendent Arthur Allison described at length the training materials which apprentices must master in the Maintenance Department in order to become qualified journeymen. Selected course materials for each of the apprentice programs were introduced as exhibits. It is evident from these documents, and from Mr. Allison's testimony, that a high level of reading, writing and mathematical skill is required for completion of the apprenticeship programs and satisfactory performance in the craft-journeymen positions.

Evidence was also introduced concerning the job requirements in selected operating departments. In the Tall Oil Department, for instance, operators must be able to operate pumps, heat exchanges, reboilers, and must have a basic knowledge of fractions. They must understand the operation of instrumentation and control systems, and they must also have an understanding of boiler operations. Such knowledge is attained through years of training and progression from one job to another in the sequence. The record discloses that it may take as much as a year for a second operator to become trained as a fully proficient first operator, and as much as six months continuous training for a third operator to be proficient in the second operator's job. Similar training is necessary for a crude plant operator to learn the third operator's job. The functional relationship between the various jobs in the Tall Oil Department, and the nature of the work there, was explained in detail by P. W. Wright, Westvaco's Manager of Commercial Services. Mr. Wright described the hazards that are involved in promoting unqualified persons to operating positions in the department. Miscalculation on the part of an operator can create safety hazards and result in damage to millions of dollars of equipment.

Evidence concerning the requirements of jobs in the Recovery Department was similarly introduced by Westvaco. Louis Chaddick, the Recovery Superintendent, testified regarding the training periods required for operators in the Recovery sequence, and he explained the complexities of each position. Mr. Chaddick explained that operators in the Recovery sequence perform a series of

complicated, interrelated functions, which include accurate maintenance and monitoring of steam and flow pressures, temperature control, chemical analysis, and an understanding of the evaporation process and boiler operations. Operator error can result in explosions, safety hazards, and substantial disruption of production services. As is true in other sequences, the complexities of the jobs increase as one promotes up the line. In the higher jobs, employees must have the ability to keep a large number of variables in their minds, relating one to another, such as tank levels, concentrations and flow levels, and these employees must be able to make necessary adjustments. Mr. Chaddick noted that the Company has been unsuccessful in its efforts to train various class members in higher operating positions. Elijah Sparkman is the only member of the affected class who has been able to perform the operator job at the top of the sequence. Leroy Jones, Thomas Randolph, David Middleton, S. Singleton, D. Seabrook, N. Coleman, and L. Melvin are all frozen in their respective positions at lower jobs in the sequence and have been bypassed by junior blacks and whites.

The record further demonstrates that in the Finishing and Shipping Department, jobs other than the former 620 positions require a level of literacy and mathematical ability not possessed by the vast majority of the former 620 members in that department. As a result, many of the older blacks waived promotion to the higher skilled positions in that sequence.

*Westvaco's Efforts to Upgrade the Skill and Educational Levels of Black Employees and Related Affirmative Action Measures:*

The record establishes that the great majority of employees who held 620 jobs prior to the merger lacked the basic skills and education to perform operating jobs in the sequences represented by the other Unions. Many of the black employees, who were employed prior to 1960, had little or no formal education. Of 155 class members listed in exhibits offered by plaintiffs who were hired prior to 1964, 115 were hired in the 1940's or earlier, and another 30 were hired in the 1950's. A study of the general educational levels of black employees in 620 jobs in the Woodyard, which was conducted in 1961, portrays the extent of the illiteracy problem in that department. Of 89 black employees who were evaluated at that time, 67% were either completely illiterate—(unable to read at all)—or were "nearly illiterate." The mean and average ages for this group was approximately 40 years, which indicated that the majority of this group had received their formal education, if any, 20 to 30 years earlier. Sixty percent of the group had no telephone in their homes and could not be contacted for call out, notification of shift changes, emergency relief, or unscheduled overtime.

The absence of promotable black employees in 620 jobs in the Woodyard became an increasing problem as new production processes and methods were introduced and manual operations were automated. Illustrative of this is the evidence concerning the initial staffing of the Longwood sequence in the Woodyard in 1966. The Longwood operator was required to operate new machinery which was different and more complex than that used in the processing of "round wood." Westvaco determined that a new promotion sequence was necessary because it was not feasible to attempt to staff the Longwood jobs by promotion of Woodyard employees on a seniority basis. Accordingly, a new sequence was established for the Longwood jobs under the jurisdiction of Local 620. Of the 12 persons initially assigned to the Longwood jobs, six transferred from the yard labor pool out of seniority order, three transferred from other departments, and three were new hires. In the initial staffing of the jobs, there was an equal distribution of white and black employees. Westvaco's staffing of these jobs out of seniority order was upheld by Arbitrator George E. Strong, an arbitrator appointed by the Federal Mediation and Conciliation Service. Arbitrator Strong noted that it was not possible to staff the jobs strictly on a seniority basis with Woodyard employees because the jobs "required other skills than those possessed" by Local 620's members in the Woodyard.

The Woodyard was not the only department in which the low literacy level of black employees posed serious problems to Westvaco. Of 33 black employees in the Finishing and Shipping Department about the time of the merger of sequences in 1968, only 13 sought promotion to higher jobs. The other 20 employees expressed their desire to remain in the positions they were holding. Moreover, the evidence reveals that eight of the ten black poolmen, who had been car bracers before the merger, had so little education that they could not sufficiently read or write to perform the new poolman position, much less promote to higher jobs in the sequence.

The record establishes that in 1969, Westvaco implemented an adult education program in an effort to provide black employees with the reading, writing and mathematical skills needed for promotion to higher jobs in the sequences. Initially, the program was offered to former 620 members in the Finishing and Shipping Department. Westvaco paid such employees their straight time hourly rate for attending the classes and paid for the course materials, teachers' salaries and all other costs incidental to the program. Fourteen black employees in Finishing and Shipping expressed an interest in the program and 11 actually enrolled in the class. Of the 11 employees who enrolled, 3 voluntarily left the program, 3 made no progress, and 5 made significant progress, achieving between second and fifth grade level abilities in reading and arithmetic.

On February 17, 1970, J.H.W. Guerard, Westvaco's Labor Relations Coordinator, submitted a written report on the results of this initial adult education program in the Finishing and Shipping Department. Mr. Guerard recommended that the program be expanded to include the large number of former 620 members in the Woodyard and other departments of the Mill who were "incapable of advancing to a higher rated job because of a lack of basic education." Mr. Guerard's recommendation was accepted, and on July 30, 1970, the program was extended to all departments. There were 41 black employees from the Woodyard, 8

from Recovery, 4 from Power, 1 from Technical Services, 4 from Polychemical, and 1 from Tall Oil who responded by enrolling in the program. The record establishes that Westvaco arranged and paid for eye examinations for the former 620 members who were to be enrolled and paid for such glasses as were prescribed. The result of these efforts was mixed. Some blacks were terminated from the program for poor attendance or lack of progress, while others made substantial progress.

Westvaco also established a General Education Development—(GED)—training program for those employees who were interested in continuing their education. Two of the black employees who took advantage of these educational opportunities were Isaiah Moorer and Nelson Rivers in the Polychemicals Department. Both are presently in the top operator positions in that department.

Notwithstanding Westvaco's efforts to provide former 620 members with the basic educational skills needed for promotion, most of the long service black employees repeatedly declined opportunities to transfer or promote to the higher paying operating jobs. In the lines of progression, large numbers of these employees signed waiver forms evidencing their decision not to promote. Exhibits introduced by Westvaco record the names of 85 black employees who at one time or another waived promotional opportunities. Additional waivers by these and other black employees are reflected in Westvaco's supplemental evidence. In addition to these employees, there were a large number of black employees in the Woodyard labor pool and cartage or service progression who declined opportunities to advance to the higher rated operating positions. The record discloses that meetings were held with these employees by Westvaco management to advise them specifically about available openings. Notices of the available openings were also posted in the department.

Under Westvaco's waiver policy, a waiver is good only for such time as the employee elects to leave the waiver in effect. If an

employee elects to refuse temporary promotion to a higher job in the sequence, his action operates to disqualify him for the next permanent vacancy in that job. If an employee elects to refuse permanent promotion to a higher position in the sequence, the waiver policy provides that junior employees, who bypass him—(promote around him)—to higher jobs in the sequence, will thereafter have seniority over him "on all higher jobs which they work."

The record contains additional examples of affirmative action efforts undertaken by Westvaco during the period. R. M. Hendricks, Westvaco's Industrial Relations Manager, testified that in May, 1968, he met with Willis Gantlin to advise him of a skills program which was then being offered to community residents by the Charleston Industrial Education Center. Hendricks served on the Board of Directors of that program and felt that 620 members might be able to obtain skills needed for promotion through that program. Other instances of affirmative action efforts on the part of Westvaco's management were reflected in the testimony of various witnesses. Willis Gantlin was offered the opportunity to transfer to laboratory technician. Mr. Gantlin was also requested to provide the personnel office with names of qualified blacks who might be interested in employment. An interview with the personnel office was set up for Alphonse Gailliard to see if he would be interested in transferring to another department, after he had been disqualified for promotion in his own department, but Mr. Gailliard failed to attend the interview. In 1967, the personnel office contacted Earl Cook, who at that time was on layoff, and asked him if he would be interested in the pipefitter apprentice program, but Mr. Cook was not interested at that time. Black employees who had difficulty handling higher jobs in the lines of progression were also given additional training. Nelson Rivers, after being disqualified from promotion in the Polychemicals Department, was given additional training opportunities and has since promoted up the sequence. Mr. Rivers is now one of three blacks who has been promoted to the top job in that sequence. Black employees in the brickmason laborer classification were selected for special training as painters and carpenters. Instructions were issued by Westvaco's personnel office to all department supervisors at the time of the merger to make special training efforts to qualify black employees for promotion.

■ The evidence establishes that Westvaco has maintained an affirmative action policy which included the adoption of specific goals for increased employment of minorities in maintenance and other responsible positions. The Company has participated in career day programs at predominantly black high schools and has worked with job placement counselors at those schools. Other referral sources which the Company contacted in an attempt to attract minority candidates for specific jobs include the State Employment Service, the Technical Education Center, local employment agencies and area business schools. Contacts were also established with various union hiring halls in an effort to locate black journeymen in the mechanical trades. The Naval Shipyard and Transportation Depot were also requested to refer minority candidates.

*Charges of Discrimination:*

The first charge of discrimination filed by any of the named plaintiffs with the EEOC was filed by Willis L. Gantlin on April 25, 1967. Named as respondents in that charge were Westvaco, IBPS and Local 508. Gantlin's charge alleged segregated local unions and discriminatory assignment practices.

By letters dated March 11, 1969, the NAACP Legal Defense Fund filed identical supplemental charges of discrimination with both the Office of Federal Contract Compliance—(OFCC)—and the EEOC, which letters named Westvaco and all the Unions as respondents. These charges were filed on behalf of each of the named plaintiffs, except Christopher Jenkins. Also named as charging parties were Richard L. Scott, L. Haywood, James Gadson, Jr., and William Frederick.

On August 5, 1969, the EEOC issued a "reasonable cause" finding on Gantlin's charges and advised the parties that it would undertake conciliation efforts. The determination letter of the EEOC, citing *Quarles v. Philip Morris, Inc.*, 279 F.Supp. 505 (E.D.Va.1968), and other cases which were subsequently overruled by *Teamsters*, stated in pertinent part, with respect to Westvaco's seniority system:

> It should be noted that it is not the job seniority system itself that is unlawful under Title VII. Rather, the unlawful discrimination consists in the present imposition of that system upon a departmental structure that itself was organized on a racially segregated basis. Used in that context, the job seniority system becomes an instrument for perpetuating pre-Act discrimination and, therefore, is not a bona fide seniority system within the meaning of Section 703(h) and is unlawful.

On December 16, 1969, the EEOC advised Westvaco by letter that an investigation of the charges filed might be mooted by full and appropriate conciliation. Thereafter, on March 27, 1970, the EEOC advised Westvaco that any effort to conciliate should include all pending charges and further advised that "counsel for the charging parties has already indicated that an agreement like or equal to the Court decisions in *U. S. v. Local 189, Papermakers & Paperworkers, Crown Zellerbach, et al.*, 282 F.Supp. 39 (E.D.La.1968), is the least the charging parties could consider in settlement." By this time, however, Westvaco was already in conciliation discussions with the OFCC on the identical charges which the Legal Defense Fund had filed with that Agency. The OFCC had also advised Westvaco that an agreement embodying the principles of the *Crown Zellerbach* decision would be necessary in order to conciliate the charges. The evidence establishes that attorneys associated with the NAACP Legal Defense Fund were counsel for Mr. Gantlin and the other charging parties throughout this period of time.

On May 20, 1970, the OFCC and EEOC entered into a *Memorandum of Understanding* in which the two agencies agreed to coordinate their investigation and conciliation activities so as to avoid "duplication of compliance activities" against the same employers. Pursuant to this Memorandum, charges filed with OFCC were treated by EEOC as charges filed with that agency for purposes of investigation. The Memorandum further specified that EEOC transmit "reasonable cause" findings against the employer-contractor to OFCC for conciliation pursuant to the "show cause" procedure under Executive Order 11246.

The record establishes that Westvaco advised both EEOC and OFCC of the parallel conciliation discussions and requested that the two agencies coordinate their activities, since a conciliation agreement with one would satisfy the objectives of all parties. The EEOC did not pursue the matter thereafter, but left OFCC to conciliate the charges. On June 19, 1970, Westvaco revised its "Affirmative Action Plan" to incorporate the conciliation demands of the Federal agencies. Westvaco's plan, which embodied the Crown Zellerbach principle of applying mill seniority when blacks competed with whites and included the red circle concept, was submitted to OFCC for approval on July 2, 1970. On July 9, 1970, the OFCC advised Westvaco that its program was acceptable and that the Company had achieved compliance with Federal EEO requirements. No further action was ever taken by the EEOC. Thereafter, Westvaco submitted a Memorandum of Understanding to IBPS—(Local 508)—and UPP—(Local 435)—which embraced the terms and principles of Westvaco's new Affirmative Action Program. In October, 1970, the Memorandum of Understanding was ratified by a vote of the membership of the local unions and on November 13, 1970, representatives of the Unions and Westvaco executed the "Memorandum of Understanding of 1970." The IBEW indicated its agreement to the Memorandum shortly thereafter.

When Westvaco agreed to the conciliation demands of the OFCC in 1970, and there-

after obtained the Unions' agreement to such terms, it did so with the understanding that it was agreeing to the conciliation proposals of the OFCC, the EEOC, and the charging parties, and that all charges filed against the Company had been resolved.

One of the defenses asserted by Westvaco at trial was that the aforementioned conciliation agreement effectively settled all claims of the charging parties filed prior to its adoption. Plaintiffs attempted to counter this defense by asserting that they never became parties to the agreement and never expressly agreed to settle their claims on this basis. Moreover, they argued that Westvaco and the Unions failed to properly communicate the terms of the Memorandum to class members and conspired to delay its implementation. In this regard, plaintiffs particularly criticized the agreement reached between the Company and the Unions that the Memorandum of Understanding should not be interpreted to abolish prior recall and pushup rights established under the labor contracts.

The record establishes that prior to the Memorandum of Understanding of 1970, employees in the lines of progression pushed up to the next job level on the basis of job seniority and qualifications. Under the contract, the "regular" pushup man acquired contract rights to the next vacancy in the job to which he regularly pushed up. It was also a recognized practice that an employee who was involuntarily removed from his permanent job, not due to his fault, had the contract right to be recalled to that job before the job would be offered to other employees.

The Memorandum of Understanding of 1970, to which Westvaco agreed in its negotiations with the OFCC, and which was accepted by the UPIU and IBEW Local Unions, did not purport to abolish these previously acquired contract rights; rather, the basic feature of the Memorandum was to substitute mill seniority for job seniority in circumstances when affected class employees competed with non-affected class employees on a seniority basis for promotion to "the next higher classification" in the same line of progression within a production department.

In the initial period following adoption and implementation of the Memorandum, the Company and Union honored the regular pushup man's contract right to promote to the next vacancy and continued to honor the recall rights of employees. The record establishes that there was no business alternative to the decision to honor the promotional right of the regular pushup man. The training periods to qualify individuals on the great majority of the jobs were sufficiently extensive as to make it impossible to follow any other procedure. In many cases, the regular pushup man had actually been performing the higher vacancy for months, or even years, and he was the only person qualified to fill that vacancy when it arose.

In the months that followed the execution of the Memorandum of Understanding, efforts were made to qualify affected class employees for higher jobs in the sequence as promptly as possible. The evidence indicates that by the time of trial, the regular pushup man rule had exhausted itself and the Company and Unions had ceased to recognize recall rights.

The record reflects many examples of promotions by black employees with mill seniority around white employees with job seniority in the various lines of progression pursuant to the terms of the Memorandum. Examples of such promotions to which the parties have stipulated are recorded in paragraph 45 of the Pretrial Stipulation. As noted on page 27 of the Stipulation, the first permanent promotion of an affected class employee on a mill seniority basis occurred in the Pulp Mill on September 1, 1971, when John Smalls promoted to Senior Second Operator, bypassing R. L. Young and F. Rabon, two white employees with job seniority.

Analysis of the record evidence does not support plaintiffs' contention that defendants conspired to conceal the existence of the Memorandum and to delay its implementation. The court finds such allegations to be totally without merit. The rec-

ord discloses that Westvaco distributed copies of its 1970 Affirmative Action Plan, which embodied the terms of the Memorandum, to the superintendents of all its departments and held meetings with its management to explain the Memorandum's purpose and effect. Special meetings were held with the supervisors of each department for this purpose and attendance was mandatory. In addition, the Memorandum was fully reviewed with representatives of the Unions. Thereafter, Locals 508 and 435 of the UPIU, and Local 1753 of the IBEW, held meetings of their respective memberships to explain the Memorandum and to vote whether or not to accept its terms. The record shows that several such meetings took place and that the meetings were open to all members of the Unions irrespective of their race. Dues check-off records identifying Union members were introduced into evidence which show many black members in the Unions at the time. Prior to the meetings notices were posted on Mill bulletin boards to advise members of the upcoming meeting and vote.

The Memorandum of Understanding was initially submitted to a vote by Local 435 at a special meeting of the membership on August 25, 1970. At that meeting, the membership of the Union voted to reject the Memorandum. The minutes of that meeting show 88 votes against acceptance and 7 votes for acceptance of the Memorandum. On October 19, 1970, a second special meeting of the membership was held by Local 435 for the purpose of voting again on the Memorandum. The minutes of that meeting show that the text of the Memorandum was again read and discussed. At this meeting the membership voted to accept the Memorandum by a vote of 65 to 11. A copy of the Memorandum was placed in the minute book of Local 435 and in the side agreement books which, along with the labor agreement, were distributed to Union stewards and made available for inspection by Union members. The record further reveals that a vote on the Memorandum by the members of Local 508 occurred at a special meeting which was held on August 18, 1970. There were 45 votes to accept the

Memorandum and 1 vote to reject it. At a subsequent meeting on September 1, 1970, the membership of Local 508 approved a motion to post notices on the Mill bulletin boards advising employees who might have questions about the Memorandum to contact the Union officers for an explanation of its terms.

Westvaco supervisors also made efforts in 1970 to explain the terms of the Memorandum to employees in their departments. In the Polychemicals Department, R. L. Naylor, the Production Superintendent, held meetings with all employees on each shift and reviewed the various provisions of the Memorandum. Black employees in the Polychemicals Department at that time included Nelson Rivers, P. Moorer, Isiah Moorer, N. Riley, C. Liggins, and H. Wigfall. Louis Chaddick, the Recovery Superintendent, personally took steps to contact those black employees in his department who had previously waived promotion to instruct them as to their rights under the Memorandum. Mr. Chaddick also testified that he was present when the Memorandum was explained to various black employees by other supervisory employees. E. C. Kennedy, the Crude Plant Supervisor in the Tall Oil Department, and P. W. Wright, the Production Manager of Tall Oil, similarly testified that the Memorandum was explained to employees in their department in 1970. The court credits Mr. Kennedy's testimony that Willis Gantlin was present during one of those discussions.

Although Willis Gantlin and several black employees testified at trial that they were never told about the Memorandum by the Company or by the Unions, other black employees who were called to testify candidly admitted that they were aware of the Memorandum and corroborated the testimony of Company and Union witnesses as to the manner in which the Memorandum was communicated to the employees. Uly Rhodes, a black employee in the Finishing and Shipping Department, testified that he saw the notices which Local 435 posted in 1970 concerning the Memorandum. Mr. Rhodes stated that he and two other black members

of the Union, Joe Myers and James Richardson, went to the meeting together and heard the Union President and International Representative explain the terms of the Memorandum. Mr. Rhodes testified that the meeting was "full of people," and he further stated that thereafter he discussed the Memorandum with "quite a few" black employees, although he could not recall all of such employee's names. He did remember, however, that he had talked about the Memorandum in 1970 with Eddie Ford, James Williams, and a black employee named Green. Nelson Rivers, a black member of Local 508, and an employee of the Polychemicals Department, similarly testified that he has known about the Memorandum since 1970 and that he learned about it when he attended Union meetings. Arthur Alston admitted that he was told about his rights to promote using mill seniority by his supervisor in 1970. Alfred Pinckney could not remember when he first heard about the Memorandum, but he identified his signature on a petition that was circulated in 1970 by a group of employees in the Power sequence, which petition protested implementation of mill seniority rights as a basis for promotion in that department. Other black employees who signed that petition were Joshua Maynor, W. D. Jones, and R. L. Campbell. The petition was circulated sometime prior to September 30, 1970. George Chatman, one of the named plaintiffs, and an employee of the Woodyard, admitted under cross-examination that he knew in the summer of 1970 about the changes in the seniority system. Mr. Chatman admitted that he saw a notice which Local 508 posted in the locker room of the Woodyard in 1970 concerning "changing the seniority system."

The above testimony by plaintiffs' own witnesses sharply contradicts their contention that defendants attempted to conceal the Memorandum from black employees, and this testimony seriously challenges the credibility of Willis Gantlin and other witnesses for plaintiffs who professed to have had no knowledge of the Memorandum's existence. In this regard, Mr. Gantlin's own testimony under cross-examination is particularly revealing, both as to his credibility and his motivation; he admitted that he had a copy of the Memorandum but he professed never to have read it because he did not want to know about it until he had given his testimony at trial. He first stated that he had never talked with other employees about the Memorandum, but when he was reminded that various employees had testified to the contrary, he admitted that he "might have mentioned" it to them. He further admitted that he had promoted around whites with job seniority under the terms of the Memorandum, but he professed that he did not realize it at the time. The record also reveals that Mr. Gantlin was in communication with NAACP Legal Defense Fund attorneys throughout 1970 and that his attorneys were aware of the mill seniority agreement.

The credibility of Mr. Gantlin and other black employees, who testified that they were unaware of the Memorandum of Understanding until after the instant suit was filed, was also called into question by the testimony of various Union representatives. These witnesses were questioned extensively concerning the minutes of Union meetings in 1970–1971 and by reference to such minutes they identified the names of several black employees who were active members of Local 508 and who regularly attended Union meetings during the period. While there was no record of everyone in attendance at the meetings held in 1970–1971, the minutes do reflect that Christopher Jenkins was present at Union meetings on April 1, 1970, October 6 and 20, 1970, and on May 18, 1971; A. Gardner was present on April 7, 1970, October 20, 1970, and on June 1, 1971; Mr. Gantlin was present on November 3, 1970, December 1, 1970, June 1, 1971, and on November 16, 1971. Various other black employees were identified as regularly attending Union meetings in 1970. In addition, the record shows that P. Ingram, J. Kelley, P. Kelley, Christopher Jenkins, H. Jackson, L. White, J. Gadsden and Gantlin were Union stewards in 1970 and that Wilson Melvin was on the Union Negotiating Committee during

the years 1968 to 1974. The foregoing evidence dispels any notion that there was a conspiracy on the part of defendants to conceal the terms of the Memorandum from black employees. On the contrary, the record establishes that the Memorandum was well communicated throughout the plant. In summary, the evidence does not support any of plaintiffs' allegations concerning concealment of the Memorandum of Understanding of 1970. The decision to honor previously acquired pushup and recall rights was a rational interpretation of the Memorandum which was consistent with sound business judgment, and there was no conspiracy to conceal the existence of the Memorandum or to delay its implementation.

█ The court is sympathetic to Westvaco's contention that plaintiffs' charges of discrimination were settled pursuant to the conciliation discussions that led to the adoption of the Memorandum. However, there is insufficient evidence to support a determination that a binding settlement agreement existed which would preclude plaintiffs from maintaining this action.

*The 1978 Court Proceedings:*

An important adjunct to the trial record in this case is the product of the two supplemental court hearings convened in Charleston in 1978 at the behest of the opposing litigants. The first hearing took place on July 14, 1978, and the second hearing was held on December 19, 1978. Because of the time that had elapsed between the date of the trial and the receipt of the trial transcript, the July hearing was held for the avowed purpose of exploring a means of updating the trial record, as well as defining and narrowing the issues to be briefed, including an expression of what injunctive requests, if any, plaintiffs intended to advance.

At the hearing in July, 1978, the court granted Westvaco leave to "supplement the record" to show the current status of class members. The court also set a briefing schedule, including a date for advance submission by plaintiffs of a statement of the issues and a decision by the plaintiffs as to what, if any, injunctive relief they would seek. The purpose of this procedure was to eliminate unnecessary issues for briefing by the parties and for resolution by the court.

At the hearing on December 19, 1978, the court permitted Westvaco to introduce, as supplements to the record, various line of progression charts, waiver forms and employment record cards which revealed the then current promotional status of black employees. Since plaintiffs' position with respect to injunctive relief was still unclear at that time, the court again requested plaintiffs to clarify their contentions. The transcript of that hearing clearly reflects a stipulation from plaintiffs that on-going practices at the Mill were free of discrimination. Plaintiffs were asked to state for the record whether they would stipulate that all practices at the Mill, which had been on-going since May 8, 1968, were similarly free of discrimination. The transcript reveals that plaintiffs failed to respond to this inquiry, and, as a result, they were directed to file their response thereto on or before January 5, 1979, and they were specifically admonished that, if they failed to so respond, the court would hold as a matter of law that there was no discrimination issue in the case with respect to any of the practices of defendants, contractual or otherwise, after May 8, 1968. The record indicates that plaintiffs ignored the court's admonition and filed no response on or before January 5, 1979. The court was thereafter surprised when plaintiffs raised the issue of injunctive relief, and post-1968 discriminatory practices, in their briefs which they filed in February, 1980. However, out of concern for the rights of the class, the court has decided not to act on its admonition to plaintiffs' counsel.

The supplemental exhibits which Westvaco filed, and which are unchallenged by plaintiffs, clearly reveal only ten black employees in the various lines of progression who have not advanced as high as their Mill seniority can possibly take them. Seniority, of course, is not the sole criteria for advancement. Employees must also possess

the skills needed to perform the jobs and they must await a vacancy in the jobs they seek.

■ The court has carefully reviewed the evidence covering both the pre-merger and post-merger periods. As noted in the earlier findings articulated herein, the evidence in this case indicates no discrimination in job assignment, transfer or promotion practices at any time subsequent to July 2, 1965, and the evidence further reveals that the seniority practices at the Mill are bona fide; hence, there is no factual or legal basis for the injunctive relief plaintiffs seek.

*Allegations of Unfair Representation by the Defendant Unions:*

It is unnecessary to separately state the court's findings relevant to plaintiffs' allegations of unfair representation, since these allegations are based on collective bargain practices and policies which the court has heretofore addressed. Plaintiffs do not contend that the Union defendants discriminated against blacks in any other respect, such as failing to process their grievances, denying them membership, or otherwise depriving them of representation or union benefits. The findings which the court has earlier herein made are, therefore, dispositive of the unfair representation allegations.

## CONCLUSIONS OF LAW

*Jurisdiction:*

This is a class action for alleged racial discrimination in employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. With respect to the defendant Unions, the complaint also alleges a breach of the duty of fair representation under 29 U.S.C. § 185. The court has jurisdiction of this action pursuant to 42 U.S.C. § 2000e–5(f) and 28 U.S.C. § 1343.

*Statutes of Limitation:*

To the extent plaintiffs seek to proceed under Title VII of the Civil Rights Act of 1964, it is well established that only those acts and practices which were made the basis of a timely EEOC charge are actionable. In the instant case, the record establishes that the first EEOC charge filed by any of the named plaintiffs was filed by Willis Gantlin on April 25, 1967. As then drafted, 706(d) of the Act specified that acts occurring more than 90 days prior to the filing of the charge (i. e., before January 25, 1967) were time barred. As noted by the Supreme Court in *United Air Lines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), any discriminatory act occurring prior to that date is "the legal equivalent of a discriminatory act which occurred before the statute was passed." 431 U.S. at 558, 97 S.Ct. at 1889.

■ The Civil Rights Act of 1866 contains no statute of limitations. Under such circumstances, the courts have generally held that the state statute of limitations governing the most analogous state cause of action is applicable. *Johnson v. Railway Express Agency,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975). This court has previously ruled that in South Carolina the statute of limitations applicable to § 1983 actions is the six year period specified in § 10–143(1) of the South Carolina Code. In so holding, the court rejected the argument of Westvaco's counsel that the one-year statute embodied in South Carolina Code § 10–146(1) was the proper statute to apply since it was the court's opinion that § 10–146(1) was unconstitutional. *Lewis v. Bloomsburg Mills, Inc.,* 8 FEP Cases 742 (D.C.S.C.1974).

The complaint in this action was filed by plaintiffs on June 15, 1972. Accordingly, to the extent plaintiffs seek relief in this action for acts and practices of the defendants which pre-date June 15, 1966, such claims of the plaintiffs are clearly not cognizable under 42 U.S.C. § 1983 because they are time barred by the six-year limitations period contained in South Carolina Code § 10–143(1), now codified at S.C.Code § 15–3–530(1) (1976).

*The Alleged "Actionable" Period* :

The maximum outer limit of the alleged actionable period in this case cannot extend beyond June 15, 1966. Plaintiffs *stipulated* prior to trial that there was no discrimination in the initial placement of black employees in the production lines of progression after May 8, 1968, the date of the merger of sequences. Thus, with respect to the production departments at the Mill, the period 'in which the court must scrutinize the initial placement of employees begins on June 15, 1966, and ends May 8, 1968. Plaintiffs would not concede prior to trial that there was no discrimination in the selection of apprentices for the various craft maintenance apprenticeship programs after May 8, 1968. Subsequently, however, plaintiffs conceded this point except with respect to the individual applications of four black employees. In any event, the record evidence does not support such an allegation even had plaintiffs not abandoned it, nor does the evidence show that the four individuals whom plaintiffs cited—(Fladger, Campbell, Singleton, and Carter)—were discriminatorily denied admission to the apprenticeship positions. Thus, it is clear to the court that the only alleged period of discrimination on which plaintiffs might conceivably base their claims for relief in this action is the period June 15, 1966, to May 8, 1968, assuming that equitable considerations do not warrant a further limiting of the period.

*Burden of Proof* :

 It is well established that plaintiffs in a Title VII employment discrimination case "have the traditional civil litigation burden of establishing that the acts they complain of constituted discrimination in violation of Title VII." *General Electric Co. v. Gilbert*, 429 U.S. 125, 137 n.14, 97 S.Ct. 401, 408 n.14, 50 L.Ed.2d 343 (1976). The burden of proof is at least equally great when the action is instituted under 42 U.S.C. § 1981. *Croker v. Boeing Co.*, 437 F.Supp. 1138 (E.D.Pa.1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

 In *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court held that proof of discriminatory racial purpose is necessary to make out a constitutional violation in an employment discrimination case. Since that decision, the courts have accepted the proposition that in a § 1981 case, "the plaintiff must prove a racially discriminatory purpose." *Croker v. Boeing Co., supra*, at 1181.

Proof of a discriminatory racial purpose is also required in this case with respect to plaintiffs' allegations under Title VII. In *International Brotherhood of Teamsters v. United States, supra*, the Supreme Court recognized that "disparate impact" claims are distinguishable from "disparate treatment" claims for purposes of proof. *Teamsters*, like the instant action, was a "disparate treatment" case:

'Disparate treatment' such as alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. *Proof of discriminatory* motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–336 n.15, 97 S.Ct. 1843, 1854–55 n.15, 52 L.Ed.2d 396 (1977) (emphasis supplied).

The Supreme Court has recently articulated the proper allocation of the burden of proof and the order of presentation of such proof in a Title VII disparate treatment case. In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court vacated a decision by the Fifth Circuit Court of Appeals because that court had erroneously placed the burden of persuasion on the defendant once the plaintiff had established a prima facie case. In *Burdine*, the Supreme Court stated that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *See Board of*

*Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1979).

*The Seniority System :*

Prior to *Teamsters,* it was the law of this Circuit that a seniority system was itself unlawful under Title VII if it perpetuated the effects of pre-Act discrimination. *Robinson v. Lorillard Corp.,* 444 F.2d 791 (4th Cir. 1971). In *Teamsters,* however, the Supreme Court, citing § 703(h) of the Act, held:

> [A]n otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination. Congress *did not* intend to make it illegal for employees with vested seniority rights to continue to exercise those rights, even at the expense of pre-Act discriminatees.

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 353–354, 97 S.Ct. 1843, 1863–64, 52 L.Ed.2d 396 (1977). (Emphasis supplied).

The Supreme Court in *Teamsters* expressly noted that the § 703(h) exception applied to all types of seniority systems:

> In addition, there is no reason to suppose that Congress intended in 1964 to extend less protection to legitimate departmental seniority systems than to plant-wide systems. Then as now, seniority was measured in a number of ways, including length of time with the employer, in a particular plant, in a department, in a job, or in a line of progression ... The legislative history contains no suggestion that any one system was preferred.

*International Brotherhood of Teamsters v. United States, supra,* at 355, n.41, 97 S.Ct. at 1865 n.41.

In *United Airlines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the Supreme Court, after observing that a discriminatory act, which is not made the basis of a timely EEOC charge, has no legal significance, other than as background evidence, held:

> [A] challenge to a neutral system may not be predicated on the mere fact that a past event which has no present legal significance has affected the calculation of seniority credit, even if the past event might at one time have justified a valid claim against the employer. A contrary view would substitute a claim for seniority credit for almost every claim which is barred by limitations. Such a result would contravene the mandate of § 703(h).

*United Airlines, Inc. v. Evans, supra,* at 560, 97 S.Ct. at 1890.

Similarly, in *Teamsters,* the Supreme Court cited Evans for the proposition:

> [T]he operation of a seniority system is not unlawful under Title VII even if it perpetuates post-Act discrimination that has not been the subject of a timely charge by the discriminatee.

*International Brotherhood of Teamsters v. United States, supra,* at 348, n.30, 97 S.Ct. at 1861 n.30.

In *Teamsters,* the Supreme Court was not required to give detailed attention to the criteria by which one should measure the bona fides of a seniority system. The *Teamsters* decision has been scrutinized and interpreted by numerous lower courts. The criteria which generally emerge from these cases are reflected in the following decisions by the Fourth and Fifth Circuit Courts of Appeals: *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310 (5th Cir. 1977); *Harris v. Plastics Manufacturing Co.,* 617 F.2d 438 (5th Cir. 1980); *Swint v. Pullman-Standard,* 624 F.2d 525 (5th Cir. 1980) [4]; *United States v. Georgia Power Co.,* 634 F.2d 929 (5th Cir. 1981); *Patterson v. American Tobacco Co.,* 586 F.2d 300 (4th Cir. 1978),[5] *rehearing en banc,* 634 F.2d 744

---

4. Cert. granted 451 U.S. 906, 101 S.Ct. 1972, 68 L.Ed.2d 293 (4/20/81). However, the schedule of cases for hearing by the Supreme Court for the 1981–1982 term does not indicate even early argument of this case. This court does recognize that the decision by the Supreme Court in *Swint* may provide enlightenment for the lower federal courts in interpreting the meaning of the phrase "*bona fide seniority or merit system.*" 42 U.S.C. 2000e–2(h).

5. Cert. granted —— U.S. ——, 101 S.Ct. 3078,

(4th Cir. 1981); *Carroll v. United Steelworkers of America*, 498 F.Supp. 976 (D.Md. 1980), aff'd, 639 F.2d 778 (4th Cir. 1980); and *Johnson v. Ryder Truck Lines, Inc.*, 575 F.2d 471 (4th Cir. 1978). As noted earlier in this opinion, these criteria, among others, include the issues as to whether the seniority system had its genesis in racial discrimination; whether it was instituted to serve a racial objective or has been maintained for such illegal purpose; whether the system is facially neutral, applying alike to white and black employees so as to equally discourage intra-company transfers involving loss of previously accrued seniority; and whether there are separate bargaining units established along rational lines and in accordance with National Labor Relations Board precedents and industry patterns.

In the instant case, there is no evidence that the seniority system at Westvaco was instituted or has ever been maintained for a racial purpose. While plaintiffs have contended in their post-trial brief that the seniority system had its genesis in racial discrimination, they have offered no record evidence to support their contention and have not availed themselves of the opportunity to introduce additional evidence on this issue. *Harris v. Plastics Manufacturing Co., supra.* Indeed, in their post-trial briefs, plaintiffs virtually concede that they have presented little or no proof as to the seniority system's origins. Plaintiff's suggest, however, that specific facts can be seen or "inferred" from the evidence that blacks were only assigned to 620 jobs prior to the "early 1960's." Plaintiffs further suggest that "equally-compelling proof is found in scholarly and archival sources documenting the social and economic setting in which the Westvaco seniority system originated." The simple answer to plaintiffs' contention is that the same arguments were advanced and rejected by the Supreme

Court in *Teamsters*, and more recently by the Fourth Circuit Court of Appeals in *Carroll v. United Steelworkers of America, supra.* The fact that there was historical discrimination at the time a seniority system was adopted is hardly an unusual event in American industry. Indeed, several courts have observed that the very existence of historical overt discrimination in job assignments may well suggest that racial considerations played no part in the development of a seniority system, since it was not contemplated at the time the system was conceived that blacks would compete for the same jobs as whites.[6] *Swint v. Pullman-Standard*, 539 F.2d 77, 17 FEP Cases 730, 737 (N.D.Ala.1978), rev'd on other grounds, 624 F.2d 525 (5th Cir. 1980); *Winfield v. St. Joe Paper Company*, 20 FEP Cases (N.D.Fla.1979). The holding in *Teamsters* assumes the existence of pre-Act discrimination, as did the drafters of § 703(h). *International Brotherhood of Teamsters v. United States, supra*, at 350–355; *Carroll v. United Steelworkers, supra; Patterson v. American Tobacco Company, supra.* Moreover, as noted in Cooper & Sobol, *Seniority and Testing under Fair Employment Laws*, 82 Harv.L.Rev. 1598, 1603–1604 (1969), a treatise on seniority which the Supreme Court cited in *Teamsters*, "seniority rules are usually designed, entirely apart from racial considerations, to grant the least advantage to new employees in the unit and the most advantage to the most senior employees" and such rules normally originate from union demands at the bargaining table rather than from any management interest. It is clear from *Teamsters* that the Supreme Court interpreted § 703(h) to embrace all types of recognized seniority systems, notwithstanding the fact that such systems may tend to perpetuate pre-Act discrimination. *International Brotherhood of Teamsters v. Unit-*

69 L.Ed.2d 951 (6/15/81). The court notes that the issue to be reviewed is not an issue involved in the instant case.

**6.** The same observation can be made here. The record establishes that prior to 1963, Westvaco hired persons to perform the unskilled labor-type jobs who clearly did not possess the literacy and mathematical skills necessary to perform the operating jobs. It has only been since 1963 that all new hires at the mill have had to satisfy the higher standards for employment required of employees assigned to the operating lines of progression.

**1388**

*ed States, supra,* 431 U.S. at 355, n.41, 97 S.Ct. at 1865 n.41.

Careful examination of the record evidence in this case establishes without doubt that plaintiffs cannot prevail in their attack on the seniority system here involved and that defendants have amply demonstrated the bona fide nature of their system, thereby satisfying any burden of proof which defendants may have in this regard. The Westvaco seniority system whereby job, department, and mill seniority is accrued by employees in various departments and lines of progression is facially neutral and applies in the same manner, under the same rules, to all employees, irrespective of their race. The system itself is color blind and non-discriminatory. Moreover, Westvaco's seniority system is typical of seniority systems frequently found not only in the paper industry but in various other industries throughout the United States. Cooper & Sobol, *Seniority and Testing Under Fair Employment Laws, supra.* Finally, the establishment of three bargaining units— (IBEW, IAM and UPP/IPBS)—encompassing various production and maintenance functions is consistent with National Labor Relations Board precedent based on unit criteria wholly unrelated to racial considerations. See *NLRB v. Libbey Owens Ford Glass Co.,* 241 F.2d 831 (4th Cir. 1957), and *NLRB v. Pittsburgh Plate Glass Co.,* 270 F.2d 167 (4th Cir. 1959). Here each of the collective bargaining agreements recites the fact that the bargaining unit involved was certified by the National Labor Relations Board as an appropriate unit for bargaining purposes.

Plaintiffs have urged that the instant case is factually and legally indistinguishable from recent decisions by the District Court for the Southern District of Georgia in *Myers v. Gillman Paper Company,* 25 FEP Cases 468 (S.D.Ga.1981), and in *Miller v. Continental Can Company,* 26 FEP Cases 151 (S.D.Ga.1981). This contention has no merit.

In *Myers,* the trial court based its finding that the seniority system was non-bona fide on factors which are not present in this case. The court in *Myers* found that at the time the mill was organized by the unions, the company and the unions reached an agreement to reorganize the then existing departments and lines of progressions on a purely racial basis which reorganization forced blacks out of integrated lines of progression into new segregated lines. The court there noted that the arrangement of jobs in the new segregated lines was irrational and served no legitimate business purpose. In conjunction with the reorganization of the lines of progression, union jurisdictional agreements were recognized which precluded blacks from transferring to better jobs and which established different seniority rules for blacks and whites. The court in *Myers* found that even though white and black employees might hold identical jobs in the same line of progression, the seniority rules by which employees promoted up the sequence were different for whites and blacks, with the result that only whites could use job seniority for promotion to higher jobs. That court thus determined that the seniority system was irrational, that it was purposely molded to discriminate against blacks, and that it was not typical of the paper industry. In *Miller,* the court found that prior to 1975 blacks were victims of racial discrimination in initial assignment to production jobs, and they were thereafter prevented from transferring or promoting to the higher paying jobs held by whites, not because of overt discrimination, but rather due to the operation of defendants' seniority practices. The court noted that the Company could have achieved its discriminatory objective by an overt policy of refusing to assign blacks to production jobs which were reserved for whites, and that had it done so, the adoption of an otherwise neutral seniority system would not have been illegal. The court found, however, that defendants achieved their discriminatory objectives through the "manipulation" of the seniority system and that the seniority system was maintained for this purpose.

Each case must, of course, turn on an analysis of its individual facts. Without commenting on whether the facts in *Myers*

and *Miller* support the conclusion reached by those courts, the facts in this case are significantly distinguishable. Unlike the systems described by the court in *Myers* and *Miller*, at Westvaco the lines of progression were rationally structured to serve legitimate production objectives and such lines were in no manner structured to serve any racial purpose. Although black employees were at one time assigned only to unskilled laboring jobs, this assignment practice was not the result of any union jurisdictional agreement or seniority practice, but was rather a unilateral Company practice, in accordance with the custom at the time, which predated the unionization of the mill. Furthermore, as previously noted by the court, the seniority system at Westvaco operated in the same fashion for whites as for blacks and this seniority system was typical of the industry.

*Vested Recall and Pushup Rights* :

Plaintiffs' attack on recall rights and pushup rights of employees, which were honored by defendants during the initial period of implementation of the Memorandum of Understanding, must also fail for the same reasons that they fail in their challenge to the seniority system. In *Teamsters*, the Supreme Court emphasized that Congress did not intend to make it illegal for employees with "vested seniority rights to continue to exercise those rights, even at the expense of pre-Act discriminates." *International Brotherhood of Teamsters v. United States, supra*, 431 U.S. at 354, 97 S.Ct. at 1864. In *Alexander v. Machinists, Aero Lodge 735*, 565 F.2d 1364 (6th Cir. 1977), the Sixth Circuit specifically approved the continued recognition of recall rights and job equity rights as an integral feature of the seniority system sanctioned by *Teamsters*. Moreover, at Westvaco, the evidence indicates that continued recognition of the rights of the regular pushup man was a business necessity during the initial period after the execution of the Memorandum because of the length of the training periods for various jobs and the absence of qualified senior blacks who were capable of handling such positions.

*The Memorandum of Understanding of 1970* :

Much of the evidence in this case dealt with the provisions of the Memorandum of Understanding and the alleged failure of defendants to adequately communicate its existence. The *Teamsters* decision, of course, demonstrates that today there would be no legal requirement on defendants to agree to the provisions of the Memorandum. This is true both with respect to Title VII and § 1981. *Johnson v. Ryder Truck Lines, Inc., supra.* Thus, the evidence at trial concerning the communication of the Memorandum has little continuing significance other than as a measure of credibility of the witness who testified. The court has heretofore set forth its credibility decisions. Succinctly stated, the evidence is clear to this court that there was no conspiracy on the part of the defendants to conceal the existence of the Memorandum from black employees or to delay its implementation.

*Plaintiffs Have Failed to Carry Their Burden of Proof* :

To carry their burden, plaintiffs must prove discrimination by a preponderance of the evidence. It is well recognized that even if plaintiffs are initially successful in establishing a *prima facie* case of discrimination through statistical inferences, the employer can rebut such statistical evidence by proving "that the plaintiffs' statistical comparisons are inaccurate, or that any disparities have innocent explanations." *Croker v. Boeing Co., supra*, at 1183. "Statistics are not irrefutable; they come in an infinite variety, and like any other kind of evidence, they may be rebutted." *International Brotherhood of Teamsters v. United States, supra*, 431 U.S. at 340, 97 S.Ct. at 1857. As the Supreme Court noted in *Teamsters*, to prevail in their allegations of classwide discrimination, plaintiffs must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *International Brother-*

hood of Teamsters, at 431 U.S. at 332 n.10, 97 S.Ct. at 1853 n.10, *Croker v. Boeing Co., supra,* at 1183.

▇▇▇▇ It is well established that plaintiffs cannot sustain their burden of proving a discriminatory hiring or transfer procedure by reliance on static work force statistics attributable to pre-Act or pre-EEOC charge employment decisions. As the Fourth Circuit noted in *Patterson v. American Tobacco Co.,* 586 F.2d 300 (4th Cir. 1978), the significant statistics are those which show racial percentages of appointments "after Title VII became effective." Similarly, the Supreme Court in *Teamsters* recognized that an employer may rebut any inference that might otherwise arise from plaintiffs' statistics by showing "for example, that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination, or that during the period ... it made too few employment decisions to justify the inference" that it had engaged in a practice of discrimination. 431 U.S. at 360, 97 S.Ct. at 1867. See *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Patterson v. American Tobacco Co.,* 586 F.2d 300, 309. The court is not persuaded that plaintiffs' statistical evidence makes out a prima facie case of discrimination. However, assuming that a prima facie case has been made, it has been clearly rebutted by other statistical evidence as well as the absence of evidence of discrimination. *Roman v. ESB, Inc.,* 550 F.2d 1343, 1351 (4th Cir. 1976). Westvaco's evidence concerning the actual placement of employees during the relevant period, the absence of qualified black journeymen maintenance employees in the labor market, the low literacy levels of incumbent black employees, the literacy and mathematical requirements of the non-620 jobs, and the waiver data clearly rebut any inference of discrimination which plaintiffs' statistics might otherwise create. *Croker v. Boeing Co., supra; Roman v. ESB, Inc., supra,* at 1350; *Ambush v. Montgomery County Government,* 620 F.2d 1048, 1052–1054 (4th Cir. 1980); and *Texas Department of Community Affairs v. Burdine, supra.* Addi-

tionally, the court finds plaintiffs' statistical evidence to be misleading, incomplete and unpersuasive for the reasons previously enumerated.

The evidence in this case convinces this court that the ability to read and write and perform basic mathematics is necessary to successful performance on all jobs in the lines of progression, with the exception of the laborer-type positions formerly represented by Local 620. It is also abundantly clear from the record that most of the black employees hired at the Mill prior to 1964 were incapable of advancing up the lines of progression because of their educational limitations, notwithstanding Westvaco's subsequent efforts to qualify them for promotion. The validity of a reading and writing requirement for promotion in the lines of progression is conceded by plaintiffs. Indeed, it was the opinion of Raymond Cassetta, an Industrial Engineer who testified for plaintiffs, that a literacy requirement would be a valid precondition of employment at Westvaco's Mill.

Plaintiffs have failed to establish that the apprenticeship program age standards unlawfully perpetuated racial discrimination. The court notes that the industrial engineer, James Rigassio, who testified for plaintiffs on this issue, stated that an age limit of 45 years would be a reasonable and fair standard. Only four persons are cited by plaintiffs as being denied apprentice selection because of their age. The evidence on this issue reveals that these persons were never discriminated against because of their race in the first place, i. e., there was no discrimination to perpetuate, or, as in the case of Franklin Carter, they never desired an apprentice position until after the date that the age standards were waived. The court finds that plaintiffs have failed to prove even a prima facie case on the age issue. *Texas Department of Community Affairs v. Burdine, supra.*

In conclusion, the court finds that the evidence does not sustain plaintiffs' contentions with regard to assignment and promotional practices during the actionable peri-

od, or at any time subsequent to the enactment of Title VII. For the reasons previously articulated, the court further finds that the seniority system is embodied in each of the collective bargaining agreements is bona fide within the meaning of § 703(h).

■ Additionally, the court finds that plaintiffs have failed to prove that the transfer request system operated to discriminate against blacks. There is nothing inherently discriminatory about Westvaco's transfer request system and the record reveals that many blacks utilized this procedure to move to openings in other departments. The court finds that the transfer request system has operated in a racially neutral fashion at Westvaco.

In summary, it is the opinion of this court that the evidence adduced herein does not support plaintiffs' claims of discrimination against Westvaco and the defendant Unions. The court concludes that neither the plaintiffs nor the class they represent are entitled to any of the relief sought in the complaint and that a judgment should be entered dismissing the complaint herein.

■ The court does not feel that an award of attorney's fees or costs against plaintiffs, for which the defendants ask, would be a proper exercise of the court's discretion as the plaintiffs did not institute this suit in bad faith, nor were their legal theories so empty or frivolous as to imply a vexatious motive. *Mosby v. Webster College*, 563 F.2d 901 (8th Cir. 1977); *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

For the reasons heretofore advanced, the complaint in this action is hereby dismissed, and each party shall pay its own costs and attorney's fees.

AND IT IS SO ORDERED.